**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ROSE WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | 1:07CV00634 |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Rose Wright, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability and Disability Insurance Benefits, and for Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

**Procedural History**

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI)[1] on or about January 9, 2004 (protective filing

---

[1] The documents associated with Plaintiff's SSI application are missing from the transcript. See Tr. [i].

date, December 11, 2003), alleging a disability onset date of April 18, 2000.[2] Tr. 35-38; see also Tr. 15. The applications were denied initially and upon reconsideration. Tr. 29, 30. Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ). Tr. 32. Present at the hearing, held on September 13, 2006, were Plaintiff, her attorney, and a vocational expert (VE). Tr. 282.

By decision dated September 26, 2006, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. Tr. 12. On June 22, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, Tr. 5, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1. The claimant met the insured status requirements of the Social Security Act through December 31, 2005.
>
> 2. The claimant has not engaged in substantial gainful activity since April 18, 2000, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.). . . .
>
> 3. The claimant has the following severe impairments: major depression, arthritis in her back, degenerative disc disease, and goiter (20 CFR 404.1520(c) and 416.920(c)).
>
> These impairments cause more than a minimal limitation in the claimant's ability to perform work-related activities.

---

[2] Plaintiff had previously filed applications for DIB and SSI which were denied in 1994, but there is no indication that the ALJ reopened this decision. See Tr. 15.

> 4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). . . .
>
> 5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with additional limitations. Specifically, the undersigned finds that the claimant is able to lift and carry 10 pounds frequently and 20 pounds occasionally. She is limited to sitting/standing/ and walking at her option and needs to avoid bending, climbing, and working at heights. Additionally, due to her depression, the claimant is limited to work in a low-stress, non-production environment with only occasional supervision that is free of loud noises.

Tr. 17-18. The ALJ found that Plaintiff was unable to perform her past relevant work. Tr. 23.

Plaintiff, born on June 20, 1956, was forty-three years old as of her alleged onset date (AOD), regulatorily defined as a "younger individual age 18-44." See id. (citing 20 C.F.R. §§ 404.1563 and 416.963). The ALJ found that Plaintiff had at least a high school education, and could communicate in English. He added that transferability of job skills was not an issue in the case. Based on these factors, Plaintiff's residual functional capacity (RFC), and the VE's testimony, the ALJ concluded that Plaintiff "has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 24. Accordingly, the ALJ decided that Plaintiff was not under a "disability," as defined in the Act, from April 18, 2000, through the date of his decision. Id.

## Analysis

In her brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ (1) failed to properly assess her mental RFC; (2) did not adopt the mental RFC findings of her treating physician; and (3) presented a flawed hypothetical to the VE. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

<u>Scope of Review</u>

The Act provides that, for "eligible"[3] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[4]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe

---

[3]   Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[4]   The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in Part 404.

4

impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing any other work. Section 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).

5

If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Issues

1.  Mental RFC Assessment

Plaintiff complains that the ALJ failed to follow the "special technique" to be utilized in cases where a mental impairment has been alleged, in particular, that he failed to properly assess her mental RFC.

Effective September 20, 2000, SSA revised its regulations for evaluating mental impairments.  See "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50746-01, 50757 [hereinafter, "The Revisions"].  As provided by The Revisions, Section 404.1520a

> explain[s] that we must first evaluate the evidence to determine whether an individual has a medically determinable mental impairment(s), demonstrated by pertinent symptoms, signs, and laboratory findings. If we determine that an individual has a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings substantiating its presence.  Then, we will rate the degree of functional limitation resulting from that impairment(s) and record our findings as set out in [Section 404.1520a(c) and (e)].

The Revisions, 65 Fed. Reg. at 50747.  This process is referred to as the "technique."

The regulation next provides that, if the claimant is found to have a severe impairment, but such impairment does not meet or equal a listing, SSA will perform a mental RFC assessment.  Id. at 50748 (citing section 404.1520a(d)(3)).  "An

6

assessment of your RFC complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders when your impairment(s) is severe but neither meets nor is equivalent in severity to a listed mental disorder." Pt. 404, Subpt. P, App. 1 [hereinafter, "The Listings"], § 12.00(A). The ALJ must assess the mental abilities of "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." Section 404.1545(c). When a claimant suffers from a severe mental impairment that does not meet or equal the criteria of the listings for mental disorders, "[t]he determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity." The Listings, § 12.00(A).

Also, Ruling 96-8p specifies: "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." Social Security Ruling (SSR) 96-8p, 61 Fed. Reg. 34474-01, 344478; see also section 404.1521(b)(3)-(6). Yet, unlike the severity assessment, neither Ruling nor regulation *requires* a consideration of the listed criteria or sets forth a specific form in which the findings must be enumerated.

7

Interestingly, the ALJ completed this mental RFC assessment, describing in his hypothetical to the VE, Tr. 298, a claimant who:

•"could engage in tasks that were simple or routine in nature" (see section 404.1521(b)(3));

•"could make judgments related to simple repeat – routine, repetitive tasks" (see section 404.1521(b)(4));

•"in a low stress, non-production environment with no loud noises" (see section 404.1521(b)(5));

•"[w]here occasional supervision would be provided by a supervisor" (see section 404.1521(b)(6)).

Unfortunately, the ALJ neglected to include this complete finding in his decision, nor did he "build an 'accurate and logical bridge from the evidence to [his] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002) (quoting Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002)). See also Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000) (an ALJ's independent review of the medical evidence must bridge the evidence he is reviewing to his conclusions). Accordingly, the case should be remanded to the ALJ to complete this portion of the technique.

2.  Treating Physician's Opinion

Plaintiff argues that the ALJ was constrained to accept the mental RFC assessment of his treating physician as it was (i) the only evidence on the issue and (ii) uncontradicted by other medical evidence.  Plaintiff is mistaken in both regards.

Ruling 85-16 was formulated, "To state the policy and describe the issues to be considered when an individual with a mental impairment requires an assessment of [RFC] in order to determine the individual's capacity to engage in basic work-related activities."  SSR 85-16, 1983-1991 Soc. Sec. Rep. Serv. 352, 352 (West 1992).  The Ruling explains that "essentially the same impairment-related medical and nonmedical information is considered to determine whether the mental disorder meets listing severity as is considered to determine whether the mental impairment is of lesser severity, yet diminishes the individual's RFC."  Id. at 353. Contrary to Plaintiff's belief, that information extends beyond the purely medical, and is enumerated in the Ruling as:

> • History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psychophysiological symptoms; withdrawn or bizarre behavior; anxiety or tension.
>
> • Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.
>
> • Reports from workshops, group homes, or similar assistive entities.

Id. In addition, the fact finder is advised to consider factors such as: the quality of daily activities; the ability to sustain activities and interests, and relate to others, over a period of time; the level of intellectual functioning; and the ability to function in a work-like situation. Id. at 354.

Indeed, the ALJ considered this criteria to the extent it is evident on the record. See Tr. 20-22. Despite Plaintiff's many medical visits, there is a glaring dearth of psychological symptoms. There is no evidence that Plaintiff even consulted a behavioral health specialist, Dr. Rosario Hidalgo, until April 2004 – *four years* after her AOD.

At her initial evaluation, Plaintiff denied sustained tiredness, decreased energy, problems with concentration, and suicidal ideation – typical signs of depressive syndrome. Tr. 182; see also Tr. 127. Plaintiff also denied sustained depressed mood and apparently had not been taking an antidepressant, although it had been prescribed by her primary care physician. Tr. 182, 184; see also Tr. 222. Dr. Hidalgo determined that, although Plaintiff demonstrated "occasional depressive symptoms," she did not meet the criteria for major depressive disorder. Tr. 184. The doctor concluded that Plaintiff's condition did not warrant psychotropic medication as her symptoms were "really mild." Tr. 185-86.

Plaintiff's next documented mental health treatment was not until six months later, in October 2004. It was noted that Plaintiff's condition was "stable," and she

still was not diagnosed with depression.  Tr. 193.  Her therapist, Eunice Ngumba, assessed Plaintiff's GAF[5] at 68, indicating only mild symptoms.

Although not noted by the ALJ, Plaintiff apparently met with Dr. Ngumba on December 16 to formulate her treatment plan.  See Tr. 178.  Plaintiff agreed that her goals would include exploring both housing *and* job opportunities.  Tr. 178-79.  She listed among her strengths that she got along with everybody and helped others.  Tr. 176.  Dr. Ngumba diagnosed Plaintiff with adjustment disorder, and again assessed her GAF at 68.

When Plaintiff returned two weeks later to meet with psychiatrist Dr. David Susco for medication management, she was not doing as well.  See Tr. 20.  She reported to Dr. Susco continuing difficulties dealing with her daughter.  Tr. 175.  The doctor found Plaintiff to have a "down" mood and constricted affect, although she had neither suicidal nor homicidal ideations nor psychotic symptoms.  Moreover, Plaintiff was alert and oriented and her cognition was intact, although Dr. Susco found her insight and judgment to be limited; these observations would stay

---

[5]  Global assessment of functioning ("GAF") "is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  Boyd v. Apfel, 239 F.3d 698, 700 n.2 (5th Cir. 2001) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 1994) [hereinafter, "DSM-IV"]).  The GAF Scale, ranging from zero to 100, is divided into ten ranges of functioning, e.g., 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  The lower the GAF score, the more serious the symptoms.  A GAF of 61-70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV, at 32.

11

consistent throughout Plaintiff's three other visits which pre-dated Dr. Susco's RFC assessment.  See also Tr. 173-74; 280.

Dr. Susco diagnosed Plaintiff with major depression, and prescribed medications.  Tr. 175.  Her next mental health treatment is documented as May 2005, when she returned to Dr. Susco with improved symptoms.  See Tr. 174. Plaintiff reported that her sleep was "okay," and no crying spells.  Id.  Dr. Susco assessed her as "stable."  Id.

Although Plaintiff continued to see Dr. Susco for medication management, see Tr. 173, 280, there is no indication that she saw Dr. Ngumba for therapy until February 2006, see Tr. 20.  She complained of ongoing difficulties with her daughter and, as a result, cloistering herself in her room.  Tr. 281.  By May, however, Plaintiff's mood appeared to have improved.  She reported *no* depressive symptoms, and Dr. Susco concluded that she was "doing fair."  Tr. 277.  Although at her next visit, Plaintiff for the first (and only) time reported anhedonia, she told Dr. Susco that she was "doing fair," and this remained his assessment.  Tr. 274.

In addition, the ALJ noted that Plaintiff served as the (paid) primary caretaker for her disabled adult daughter since her July 2000 motor vehicle accident, including serving as the daughter's legal guardian.  Tr. 21; see, e.g., Tr. 168, 207, 211, 213, 227, 231, 279.  Plaintiff also reported taking care of her sick grandmother; attending a five-day retreat, Tr. 182; going on a trip to Atlantic City, Tr. 277; visiting her brother in jail, and planning a trip to visit a second brother in New York, Tr. 277.    In

12

Plaintiff's SSA "Function Report," she stated that she had no problems getting along with others. See Tr. 90, 91. Accordingly, there is no support for Dr. Susco's opinion that Plaintiff had moderate difficulty in maintaining social functioning. Plaintiff additionally related her attempts to take courses on the internet, Tr. 277, and to live independently, Tr. 276, 279.

The foregoing contradicts Dr. Susco's assessment. See Tr. 22. Dr. Susco stated that Plaintiff's GAF had been only as high as 50 over the previous year, Tr. 259, indicating "'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job),'" American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. 1994). None of these symptoms were noted in Plaintiff's records and, in fact, are contradicted by them, as discussed hereinabove.

Dr. Susco listed the following as symptoms Plaintiff had exhibited: poor memory, sleep disturbance, emotional lability, anhedonia, decreased energy, generalized persistent anxiety, and blunt, flat or inappropriate affect. Tr. 259. Yet the only time he commented on Plaintiff's memory, he described it as "intact." Tr. 277. No other mental health caregiver noted an impaired memory.

None of the mental health records contain an observation that Plaintiff was emotionally labile; her medical records fail to substantiate the claim that she demonstrated "[e]xcessive emotional reactivity associated with frequent changes or

13

swings in emotions or mood."[6] <u>Taber's Cyclopedic Medical Dictionary</u> 1127 (19th ed. 2001). And there certainly is no support for Plaintiff's suggestion that her "emotional lability became more frequent and intense as time went on." Pl.'s Br. at 13.

The only instance of Plaintiff complaining of "[d]iminished interest or pleasure in usual activities" (anhedonia) occurred *after* the date of Dr. Susco's assessment. <u>See</u> Tr. 274. To the extent that Plaintiff relies on the February 2006 visit with Dr. Ngumba, Tr. 281, during his three visits with Plaintiff thereafter, Dr. Susco assessed her mood as "fair," Tr. 274, 277, 280. As to her energy level, Plaintiff told Dr. Hidalgo that it was "good," Tr. 183; that is the only notation in the mental health records on that subject.

Furthermore, there is no evidence of "generalized persistent anxiety." Plaintiff denied anxiety symptoms to Dr. Hidalgo, and the doctor found that Plaintiff failed to meet the criteria for any anxiety disorder.[7] <u>Id.</u> And at no point did a caregiver prescribe Plaintiff an anxiolytic. As to Plaintiff's affect, Dr. Susco had consistently described it as "constricted," but never as blunt, flat, or inappropriate. <u>See</u> Tr. 173, 174, 280. Dr. Hidalgo, on the other hand, observed that Plaintiff's affect was "full

---

[6] Plaintiff's notation of a visit with Dr. Ngumba when she was both angry and "close to tears," Tr. 281, seems insufficient support for such a blanket assessment.

[7] The court acknowledges that Dr. Hidalgo diagnosed Plaintiff with adjustment disorder with depressed and *anxious* mood, Tr. 185, yet reminds Plaintiff that this diagnosis is not akin to generalized persistent anxiety.

14

range, reactive, appropriate, directed." Tr. 184. As Dr. Susco's observations of Plaintiff's symptoms are not even supported by his own records, it is reasonable not to accept his predictions as to her performance in the workplace.

In addition, Dr. Susco's assessment of the "B" criteria[8] is not supported by the record. As discussed above, there is no evidence that Plaintiff experienced "moderate" limitations in maintaining social functioning. Although Plaintiff may have "often" experienced deficiencies in concentration, persistence, and pace, there is no such showing in the record. And there is no evidence in the mental health records that Plaintiff experienced multiple episodes of deterioration or decompensation.[9]

Plaintiff states that Dr. Susco's predictions are "well-supported by medically acceptable diagnostic techniques and [are] not inconsistent with other substantial evidence in the record," Pl.'s Br. at 12, but she has not demonstrated that this is so. She refers repeatedly to the extreme "stress" that she endured in dealing with her daughter, yet she did not stop working as a result of that situation. Rather, Plaintiff

---

[8] The four criteria in paragraph "B" of the mental health listings are used to measure the severity of the functional limitations imposed by the claimant's mental impairment. The Listings, § 12.00(C).

[9] The regulations provide that

Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The Listings, § 12.00(C)(4).

15

explained that she was fired because she missed too many days from work with back pain, Tr. 58; Plaintiff's Brief even states this point, Pl.'s Br. at 12. Plaintiff's daughter was not even injured until after her AOD. <u>See</u> Tr. 235.

To be sure, Plaintiff's general practitioner noted her "extreme stress" and her doubts as to her husband's faithfulness, but he only advised Plaintiff to consider placement for her daughter; at that time, he neither diagnosed her with depression or anxiety, nor did he prescribe medication for – or even note – psychological symptoms. Tr. 231. When he next saw her, the doctor described Plaintiff as "[p]leasant." Tr. 227.

In contrast to Plaintiff's current representations, when she completed her "Function Report" in November 2004, she stated that she took care of no one and had no problems getting along with others. Tr. 86, 90. There is no observation in Plaintiff's disability documents that she suffered mental impairments as a result of her relationship with her daughter. <u>Cf.</u> <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding it "significant" to the severity analysis that plaintiff failed to allege depression in her benefits application). Plaintiff mentions her relationship with her husband, but she told Dr. Hidalgo that she had "come a long way" and could "make it without him." Tr. 182. She also refers to her reaction to not being able to work, but she had set a goal to look for work and had only one visit thereafter for back pain, which was managed with over-the-counter medication. <u>See</u> Tr. 178, 190. At no point did Plaintiff allege that she was unable to work due to a mental impairment.

16

Plaintiff urges that her "extreme" and "severe" stress prevent her from being able to engage in substantial gainful activity, yet "psychosocial stressors" is not a mental health listing, nor is it even a psychiatric diagnosis. And although depression can indeed prove disabling, the record – other than Dr. Susco's form assessment – simply does not support a finding that Plaintiff met the listing for an affective disorder. <u>See</u> The Listings, § 12.04. Overall, the ALJ's decision to discount Dr. Susco's mental health assessment is supported by substantial evidence.

Plaintiff complains of the ALJ's insistence on consistency, citing, "The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques." <u>Poulin v. Bowen</u>, 817 F.2d 865, 875 (D.C. Cir. 1987). But the ALJ's rejection of Dr. Susco's opinion, based on the absence of substantial documentation, is in accord with both the regulations and law in the Fourth Circuit. Courts evaluate and weigh medical opinions, in part, based on the supportability of the physician's opinion, and the consistency of the opinion with the record. <u>See</u> <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Further, an ALJ's decision to discount a treating physician form assessment may be upheld "where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning.'" <u>Reed v. Barnhart</u>, 399 F.3d 917, 921 (8th Cir. 2005) (quoting <u>Hogan v.</u>

17

Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (alterations in Reed)).  Accordingly, the court finds no error in the ALJ's decision not to adopt Dr. Susco's mental RFC assessment.

As to Plaintiff's charge that the ALJ impermissibly "played doctor," SSA has determined that it is the ALJ's responsibility "to identify the pertinent evidence from medical and nonmedical reports and to make findings as to the individual's ability to perform work-related activities (RFC)." SSR 85-16, 1983-1991 Soc. Sec. Rep. Serv. at 354.  See section 404.1546; see also section 404.1520a(d)(3), section 404.1527(e)(2).  Plaintiff points to no regulatory requirement that this assessment be performed by a medical expert or other physician, and the court is aware of none.

Indeed, the First Circuit Court of Appeals expresses reservations about an ALJ assessing RFC "based on a bare medical record," but allows "common-sense judgments about functional capacity based on medical findings."  Gordils v. Secretary of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) (per curiam). Specifically, an expert's RFC evaluation is *not* essential if "the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." Santiago v. Secretary of Health & Human Servs., 944 F.2d 1, 6-7 (1st Cir. 1991).

The ALJ here found that Plaintiff's mental impairment was "severe," yet (contrary to Plaintiff's explanation) such finding is required if the impairment is only "a slight abnormality . . . that has no more than a minimal effect on the ability to do

18

basic work activities."[10]   SSR 96-3p, 61 Fed. Reg. 34468, 34469.   <u>See also</u> section 404.1520(c).  Accordingly, it is not inconceivable that the ALJ find that such effect is "mild," as the ALJ did here; Plaintiff has not contested this severity finding. Because the ALJ found that the effect of Plaintiff's mental impairment on her functioning was only mild, he could therefore find the extent of her functional loss, and its effect on her job performance, to be apparent even to a layperson.

As explained by <u>Manso-Pizarro v. Secretary of Health & Human Servs.</u>, 76 F.3d 15 (1st Cir. 1996), whether the ALJ's RFC finding is supported by substantial evidence "depends on a qualitative assessment of the medical evidence that was before the ALJ.  If that evidence suggests a relatively mild . . . impairment posing, to the layperson's eye, no significant . . . restrictions, then we must uphold the ALJ's finding; elsewise, we cannot (in the absence of an expert's opinion)."  <u>Id.</u> at 17-18. Because the review of the evidence, performed above, supports the ALJ's finding of a relatively mild impairment, the ALJ did not require an expert's mental RFC opinion.

---

[10]   Indeed, Plaintiff describes her mental impairment as "disabling," yet her medical records clearly reveal that she does not meet the criteria of Listing 12.04.

19

3.  VE Testimony

Plaintiff contends that the ALJ's hypothetical to the VE was flawed because the RFC assessments were incorrect.[11]

Once the claimant reaches step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform.  Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  "The purpose of bringing in a [VE] is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).  It is well established that, for a VE's opinion to be relevant, "'it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.'"  Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) (quoting Walker, 889 F.2d at 50).  Such hypothetical, however, need only reflect those impairments supported by the record.  See Howe v. Astrue, 499 F.3d 835, 842 (8th Cir. 2007); Robbins v. Social Sec. Admin., 466 F.3d 880, 886 (9th Cir. 2006); Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Shepherd v. Apfel, 184 F.3d 1196, 1203 (10th Cir. 1999).

---

[11]   Although she here complains of the ALJ's physical RFC assessment, as mentioned by Defendant, Def.'s Br. at 2, 5, Plaintiff never presents an argument against it.

Plaintiff's first argument refers to her contention that the ALJ's hypothetical contains his own mental RFC assessment rather than one obtained from a medical expert. This issue is addressed above in Issue 2.

Plaintiff next complains that the ALJ's hypothetical to the VE failed to convey all of her mental impairments. This argument refers back to Plaintiff's allegation that the ALJ erred in not finding that she was as severely limited as Dr. Susco opined. As discussed hereinabove, the record as a whole provides substantial evidence to support the ALJ's rejection of Dr. Susco's assessment. But because the ALJ did not adequately explain how he arrived at his mental RFC assessment, the court must defer a judgment on this issue until such time as that exercise has been completed.

The court will, however, discuss Plaintiff's objection to the form of the ALJ's hypothetical. Contrary to Plaintiff's representation, the ALJ did not limit the hypothetical claimant to purely "simple, repetitive tasks," Pl.'s Br. at 19; rather, as discussed at Issue 1, above, the hypothetical addressed each of the areas of mental functioning specified by SSA in both its Rulings and its regulations. The court finds that no more specificity is required than this. Accordingly, Plaintiff's argument is ill founded.

## Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner is not supported by substantial evidence, and the correct legal principles were not applied. Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no disability be **REVERSED,**

and that the matter be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this recommendation. To this extent, Plaintiff's motion for summary judgment (pleading no. 13) seeking a reversal of the Commissioner's decision should be **GRANTED**. To the extent that Plaintiff's motion seeks an immediate award of benefits, it should be **DENIED**. Defendant's motion for judgment on the pleadings (pleading no. 17) should be **DENIED**.

WALLACE W. DIXON
United States Magistrate Judge

January 14, 2009